## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GWG Holdings, Inc. *et al.*,[1] | ) | Case No. 22-90032 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

| | | |
|---|---|---|
| GWG Holdings, Inc., and GWG Life, LLC, | ) | Adversary No. _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Fifth Season Investments, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

### COMPLAINT FOR DECLARATORY RELIEF

Plaintiffs GWG Holdings, Inc. ("GWGH") and GWG Life, LLC ("GWG Life," and together

with GWGH, the "Debtors" or "Plaintiffs"), each a debtor-in-possession in the above-captioned

chapter 11 cases, file this Complaint for Declaratory Relief (the "Complaint") against Fifth Season

Investments, LLC ("Fifth Season" or "Defendant") and allege as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538); GWG DLP Funding IV, LLC (2589); GWG DLP Funding VI, LLC (none); and GWG DLP Funding Holdings VI, LLC (none).  The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201.  Further information regarding the Debtors and these Chapter 11 Cases is available at the website of the Debtors' claims and noticing agent: https://donlinrecano.com/gwg.

## SUMMARY OF ACTION

The Debtors bring this action because Fifth Season[2]—formerly known as Chapford SMA Partnership, L.P. and the Debtors' former DIP lender—is demanding payment of an unearned $18.3 million break-up fee (the "Alternate Stalking Horse Fee").

Under the Court-approved Fee Letter (defined below) between the Debtors and  Fifth Season, there are only three ways in which the Alternate Stalking Horse Fee could have been triggered during the Chapter 11 Cases (defined below): (i) the Debtors file bid procedures under Section 363, (ii) the Debtors execute definitive documents for a sale under Section 363 or otherwise, or (iii) the Debtors *sell* at least 20% (by value or face amount) of the life insurance policy portfolio (the "Policy Portfolio") assets to a third party pursuant to a plan of reorganization.  None of those scenarios have occurred or will occur here.  As expressly stated in the Fee Letter, Fifth Season is not entitled to any fee in the event of a *bona fide* financing, which is what each of the Vida Facilities (defined below) is.

The Debtors have never sought Court approval to sell any portion of the Policy Portfolio under Section 363 or in connection with a plan of reorganization.  The Debtors did, however, enter into a Court-approved third debtor-in-possession financing facility secured by all of the Debtors' assets including the Policy Portfolio, (the "Vida DIP Facility" or "Vida Option") with Vida Capital, Inc. (n/k/a Obra Capital, Inc.) ("Vida"), which replaced the Chapford DIP Facility (defined below). Despite that the Fee Letter explicitly provides that such a *bona fide* replacement financing would ***not*** trigger the $18.3 million Alternate Stalking Horse Fee,[3] Fifth Season now asserts that the Debtors' Court-approved Vida DIP Facility (and/or the Debtors' proposed exit financing to be

---

[2] Fifth Season's counsel of record in the above-referenced chapter 11 cases has stated Fifth Season is the successor-in-interest to Chapford.

[3] The term "Alternate Stalking Horse Fee" is defined in the Fee Letter (defined at ¶1 below, and attached as **Exhibit A**).

provided by Vida (the "Vida Exit Facility", and together with the Vida DIP Facility, the "Vida Facilities")) are disguised asset sales and must be ***recharacterized*** as asset sales entitling Fifth Season to an Alternate Stalking Horse Fee.  To be clear, the Vida Facilities are not asset sales in any sense.  Fifth Season's position disregards the plain language of the applicable agreements as well as the characteristics of each of the Vida Facilities, which bear all indicia of *bona fide* post-petition secured financings.

Fifth Season cannot meet its extremely high burden to prove that either of the Vida DIP Facility or the Vida Exit Facility should be recharacterized. All aspects of the Vida Facilities are consistent with a *bona fide* financing, including, for example, that the Debtors (in the case of the Vida DIP Facility) or to-be-formed holders of the Policy Portfolio (in the case of the Vida Exit Facility) retain ownership of the collateral and any associated net residual value. The Vida Facilities contain typical financing provisions including interest rates, covenants, events of default (including upon a change of control, such as a sale of the borrowers' equity to a third party), the exercise of remedies, security interests on the Debtors' assets in favor of the lender to secure the loans, regular reporting, ongoing payment of lender fees, and voluntary prepayments (including an automatic release of liens upon repayment), and are documented pursuant to credit agreements based entirely on existing and unchallenged financing transactions. Further, the Debtors own, and will continue to own, the Policy Portfolio, and all indicia of ownership, including discretion to manage and sell individual policies and the opportunity to engage in any future sale rest entirely on the Debtors. All of which cut against any argument that the Vida Facilities are a disguised asset sale.  The Debtors are aware of no precedent for the recharacterization of a Court-approved DIP financing or exit facility as a disguised asset sale. There is no basis to break new ground and distort the plain

meaning of the documents for the sole purpose of providing an unearned windfall to an unsuccessful bidder at the expense of the Debtors' legitimate creditors.

Accordingly, the Debtors are entitled to a declaration that no Alternate Stalking Horse Fee is owed to Defendant under the Fee Letter.

## NATURE OF ACTION

1.   The Debtors seek a declaration that no Alternate Stalking Horse Fee is owed under that certain July 17, 2022 Amended and Restated Fee Letter (the "Fee Letter") (a true and correct copy of which is attached hereto as Ex. A) between the Debtors and Chapford SMA Partnership, L.P. ("Chapford" n/k/a/ Fifth Season).

## JURISDICTION AND VENUE

2.   The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.   This proceeding relates to the Chapter 11 Cases pending in the Court's Houston Division under *In re GWG Holdings, Inc., et al.*, Case No. 22-90032(MI) (Jointly Administered).

3.   This is a core proceeding under 28 U.S.C. § 157(b)(2).  Pursuant to Bankruptcy Local Rule 7008-1, the Debtors confirm their consent to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

4.   Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.   The basis for relief requested herein are Section 105(a) of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 105(a) (the "Bankruptcy Code"), and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

6.   Declaratory relief is appropriate pursuant to Bankruptcy Rules 7001(2) and 7001(8), and the Declaratory Judgment Act, § 28 U.S.C. 2201.

## PARTIES

7.   The Debtors and certain of their affiliates are debtors-in-possession in the above-captioned Chapter 11 Cases.

8.   Defendant Fifth Season is, upon information and belief, a Delaware limited liability company (filing No. 6813579) with its principal place of business at 201 Broad Street, Suite 500, Stamford, CT 06901. Fifth Season can be served with process at its address of record.

## FACTUAL ALLEGATIONS

### A.  Background

9.   On April 20, 2022 (the "Initial Petition Date"), GWGH, GWG Life, LLC, and GWG Life USA, LLC (collectively, the "Initial Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code initiating the Initial Debtors' Chapter 11 Cases (the "Chapter 11 Cases"). On April 20, 2022, the Court entered an order authorizing the joint administration of the Initial Debtors' Chapter 11 Cases. *See* [Dkt. No. 18]. On October 31, 2022 (the "DLP Petition Date"), GWG DLP Funding IV, LLC, GWG DLP Funding Holdings VI, LLC, and GWG DLP Funding VI, LLC (collectively, the "DLP Entities") filed their own voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On the DLP Petition Date, the Court entered an order authorizing the joint administration of the Initial Debtors' and the DLP Entities' cases. [Dkt. No. 970]. The Debtors have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On May 9, 2022, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed the

Committee of Bondholders [Dkt. No. 214] (the "Bondholder Committee") solely with respect to the Initial Debtors. No trustee or examiner has been appointed in the Chapter 11 Cases.

10. The Debtors' assets include the Policy Portfolio, held prepetition by special purpose vehicles (the "SPV Entities"). As of April 14, 2023, the approximate face amount of the Policy Portfolio was $1.6 billion.

**B. The Debtors' Path to Financing**

11. Prior to their bankruptcy filing, the Debtors determined they needed incremental liquidity of approximately $65 million to operate in the ordinary course of business during the Chapter 11 Cases to pay professional fees and satisfy administrative expenses, and maintain an adequate liquidity cushion for their continued operations.

12. The Debtors ultimately negotiated the Credigy DIP Facility (the "Interim DIP Facility") for which they obtained interim Court approval at the first-day hearing.

13. The Debtors promptly commenced an additional post-petition marketing process before the final hearing on the Interim DIP Facility to further explore market interest.

14. The Debtors eventually negotiated with Chapford to provide a replacement DIP Facility combined with an option agreement for Chapford to serve as a stalking horse if the Debtors elected to sell the Policy Portfolio (the "Chapford Sale Option").  The Debtors sought Court approval for their entry into the refinancing DIP Facility with Chapford (the "Chapford DIP Facility") and credit agreement (the "Chapford DIP Credit Agreement").

**1. The Chapford Sale Option Agreement**

15.  In tandem with the Chapford DIP Facility, the Debtors and Chapford also entered into an Asset Sale Option Agreement (the "Chapford Sale Option Agreement"). The Chapford Sale Option Agreement obligated Chapford to act as the stalking horse purchaser with a purchase price of $610

6

million (subject to certain adjustments, in the event that the Debtors elected, in their sole discretion and business judgment, to pursue a sale of the Policy Portfolio.

### 2. The Fee Letter

16. Because the Chapford Sale Option Agreement allowed the Debtors to seek higher and better bids to purchase the Policy Portfolio from third parties, the Debtors agreed to provide Chapford protection concerning a sale of the Policy Portfolio to another party. The Fee Letter sets forth the certain circumstances in which that protection is owed.

17. Specifically, the Fee Letter obligates the Debtors to pay Chapford an $18.3 million Alternate Stalking Horse Fee if one of the following three events occurred before July 1, 2023 (the "Stalking Horse Fee Termination Date"). As set forth in the chart below, the three events have not occurred and will not occur before the Stalking Horse Fee Termination Date.

| Event Description[4] | Fee Letter Language | Relevant Facts |
|---|---|---|
| **Event (a)**<br><br>The Debtors file bidding procedures for a 363 Sale Transaction for more than 20% of the Policy Portfolio in which anyone other than Chapford is the stalking horse bidder | "The Borrower or any of its Affiliates . . . files with the Bankruptcy Court bidding procedures in respect of a 363 Sale Transaction pursuant to which any Person other than a [Chapford] Lender Party is approved by the Bankruptcy Court as the stalking horse for the direct or indirect sale or transfer of more than 20% (by face amount or value) of the life settlement portfolio assets of the DLP Entities," other than certain exceptions, including a "bona fide financing" transaction.<br><br>Fee Letter at 3(a). | ***The Debtors have not filed any bidding procedures for a 363 Sale Transaction. Moreover, the Vida Option is a "bona fide financing" transaction.*** |
| **Event (b)**<br><br>The Debtors enter into definitive documentation for a | "The Borrower or any of its Affiliates . . . .enters into definitive documentation in respect of a 363 Sale Transaction or files a plan of reorganization which includes a sale or change of direct or | ***The Debtors have not entered into definitive documentation in respect of a 363 Sale Transaction nor filed a plan of*** |

---

[4] Capitalized terms used in this table not otherwise defined herein have the same meaning as they have in the Fee Letter.

| | | |
|---|---|---|
| sale under Section 363 of the Bankruptcy Code of, or file a plan of reorganization that include a sale or change of ownership of more than 20% of the Policy Portfolio | indirect ownership of more than 20% (by face amount or value) of the life settlement portfolio assets of the DLP Entities (including, for the avoidance of doubt, a sale or transfer of more than 20% of the Equity Interests in any DLP Entity, Holdings, or GWG Life," other than certain exceptions, including a "bona fide financing" transaction.<br><br>Fee Letter at 3(b). | *reorganization which contains or includes a process to sell or change direct or indirect ownership of more than 20% (by face amount or value) of the life settlement portfolio assets of the DLP Entities (including, for the avoidance of doubt, a sale or transfer of more than 20% of the Equity Interests in any DLP Entity, Holdings, or GWG Life," other than the contemplated trusts which fall within Fee Letter exceptions. The Vida Option is a "bona fide financing" transaction.* |
| **Event (c)**<br><br>The Debtors sell or transfer more than 20% of the Policy Portfolio outside of the bankruptcy process. | "[O]ther than (x) a 363 Sale Transaction pursuant to which a Lender Party is approved by the Bankruptcy Court as the stalking horse or (y) a 363 Sale Transaction or other sale transaction described in the immediately preceding clauses (a) and (b), the Borrower or any of its Affiliates . . . consummates or enters into an agreement to consummate a transaction or series of related transactions with any Person or group of Persons acting in concert that results or would result in a direct or indirect change of ownership of more than 20% (by face amount or value) of the policy portfolio assets of the DLP Entities . . ."<br><br>Fee Letter at 3(c) | *The Debtors have not sold (or sought to sell) any assets outside of their Chapter 11 Cases (and the DLP entities subsequently filed for bankruptcy and became part of the Chapter 11 Cases).* |

18. With respect to any transaction contemplated by event (c), if such transaction occurred after October 31, 2022 but prior to July 1, 2023, the Alternate Stalking Horse Fee would be reduced from $18.3 million to $9.15 million.

**C. The Debtors Elected to Not Exercise the Chapford Sale Option, and Instead Entered Into the Vida Option**

19. The Debtors did not exercise the Chapford Sale Option, and instead elected to exercise the Vida Option.

20. The Vida Option required Vida to provide (i) the Vida DIP Facility, a replacement debtor-in-possession financing facility in the aggregate amount of up to $630 million to refinance the existing Chapford DIP Facility as well as certain prepetition debt of the SPV Entities, and (ii) the Vida Exit Facility, an exit senior credit financing facility to refinance the Vida DIP Facility.

**1. The Vida DIP Agreement is Based on the Chapford DIP Documents**

21. The Debtors and Vida negotiated a term sheet for the Vida DIP Facility, which was attached as an exhibit to the agreement for the Vida Option (the "Vida Option Agreement") [*See* Dkt. 918-1]. (A true and correct copy of the Vida DIP term sheet is attached hereto as **Exhibit B**.) Importantly, as reflected in the term sheet, Vida and the Debtors agreed to use the Chapford DIP Credit Agreement as the starting point for the Vida DIP Facility, and adjusted based on terms described in the term sheet. [*See, e.g.,* Dkt. No. 918-1 (Vida DIP Term Sheet) at pp. 2 (capitalized terms not otherwise defined "shall have the meanings given thereto in the [Chapford] DIP Facility"), 3 (DIP Documentation Principles based on Chapford DIP Facility), 4 (collateral would be the "[s]ame as [the Chapford] DIP Facility and consistent with DIP Documentation Principles" in addition to all assets of the SPV Entities)].

22. The Vida DIP Facility's principal terms were expressly defined to ensure that the terms and conditions of the Vida DIP Facility, unless otherwise negotiated, would be "no less favorable to the Debtors and their respective subsidiaries than the terms and conditions of the [Chapford] DIP Facility." [*Id.* at pp. 3-4]. Thus, the Vida DIP Facility is based entirely on documentation for Fifth Season's own *bona fide* financing.

23. Unlike the Chapford DIP Facility which had no prepayment premium, Vida negotiated an "eroding" prepayment premium of $20 million on the Vida Facilities, which would reduce over time by the amount of interest payments paid under the Vida Facilities.  At the time of filing of this pleading, the interest paid has fully eroded any prepayment premium that would have otherwise been payable under the Vida Facilities prior to closing of the Vida Exit Facility.  The absence of any remaining prepayment premium obligation, meaning that Vida can now be repaid without penalty, is also consistent with a financing transaction and fundamentally inconsistent with any claim that the Vida DIP Facility is somehow a disguised sale.

**2. The Vida Exit Agreement is Based on the Credigy (Prepetition) Loan Documents, a *Bona Fide* Financing**

24. In connection with obtaining the Vida Option Agreement, the Debtors also negotiated the Vida Exit Facility and the agreed form of the corresponding credit agreement (the "Vida Exit Agreement").

25. The Debtors are not *obligated* to pursue the Vida Exit Facility with Vida.  The Debtors could repay the Vida DIP Facility with other sources of funds and never even enter into the Vida Exit Facility.

26. As reflected in the Vida Option, Vida and the Debtors used as the starting template for – and thus modeled the form and structure of – the Vida Exit Facility upon the National Founders, LP and GWG DLP Funding VI, LLC prepetition loan documents (the " DLP VI Facility").  [*See, e.g.,* Dkt. No. 918-2 (Exit Term Sheet) at pp. 2 (capitalized terms not otherwise defined "shall have the meanings given thereto in the DLP VI Facility"), 3 (Exit Facility Documentation Principles based on Existing DLP VI Facility), 4 (collateral would be "[b]ased on DLP VI Facility and consistent with Exit Facility Documentation Principles . . .")].

27. The Vida Exit Agreement and related documents are and will be built entirely upon the DLP VI Facility credit documents, and the Vida Exit Facility's principal terms ensure that the terms and conditions of the Vida Exit Facility would be, unless otherwise negotiated, "no less favorable to the Borrower than the terms and conditions of the [DLP VI Facility]."  [*Id.* at p 3]. No party has suggested that the DLP VI Facility which has since been refinanced by the Vida DIP Facility, was not a *bona fide* financing.  The Vida Exit Facility, based on the DLP VI Facility documentation, is a *bona fide* financing as well.

28. Further, the final Vida Exit Facility had several economic and contractual provisions that were fundamentally more favorable to the Debtors than the DLP VI Facility.  Specifically, while the DLP VI Facility contained a prepayment penalty that made any refinancing (or sale) cost-prohibitive during the ensuing years after the closing of the facility, there is no prepayment premium under the Vida Exit Facility under any circumstances, making it payable at any time without penalty, evidencing that Vida has no ownership or control of the Policy Portfolio.  Also, in the Vida Exit Agreement, Vida has agreed to inclusion of a portability feature, expressly permitting any subsequent purchaser of the Policy Portfolio assets, under specified terms and conditions, to assume the Vida Exit Facility. This portability feature expressly contemplates that the Debtors may enter into a *future* sale of the Policy Portfolio which runs counter to any argument that the Vida Exit Facility is itself a disguised asset sale.

29. Thus, the Vida DIP Facility is based on the loan documentation for, and contains the same kinds of provisions and terms as the two prior Court-approved debtor-in-possession financing facilities. Similarly, the Vida Exit Facility is based on the loan documentation for, and contains the same provisions and terms of, a prepetition credit facility that no one has ever questioned was a *bona fide* financing.

| Terms | Credigy DIP Facility | Chapford DIP Facility | Vida DIP Facility | Vida Exit Facility |
|---|---|---|---|---|
| **Borrowers** | Yes | Yes | Yes | Yes |
| **Lenders** | Yes | Yes | Yes | Yes |
| **Loan Commitment and Borrowing Limits** | Yes | Yes | Yes | Yes |
| **Maturity Date** | Yes | Yes | Yes | Yes |
| **Interest Rates** | Yes | Yes | Yes | Yes |
| **Use of Cash Collateral** | Yes | Yes | Yes | Yes |
| **Waterfall/Priority Payments** | Yes | Yes | Yes | Yes |
| **Liens** | Yes | Yes | Yes | Yes |
| **Process and Steps to Undertake to Obtain Possession of Collateral in Event of Default** | Yes | Yes | Yes | Yes |
| **Portability** | No | No | Yes | Yes |

### 3. The Debtors Exercised the Vida Option.

30. The Debtors determined that retaining ownership of the Policy Portfolio through the election and exercise of the Vida Option would result in greater benefits to the estates' creditors because of the net residual value in the Policy Portfolio that could eventually be realized from such continued ownership, but which would be lost through an immediate sale via the Chapford Sale Option. Accordingly, on October 25, 2022, the Debtors filed the *Debtors' Statement of Intent to Elect Vida Option and Memorandum in Support Thereof* [Dkt. No. 920] ("Debtors' Statement") informing the Court that Debtors intended to exercise the option to refinance the Chapford DIP Facility and incur the Vida DIP Facility (electing to abandon the Chapford Sale Option).

31. On October 26, 2022, Fifth Season filed its *Statement of Fifth Season Investment LLC in Response to Debtors' Statement of Intent to Elect the Vida Option* [Dkt. No. 937] (the "Fifth Season Statement"), claiming that if the Debtors exercised the Vida refinancing option over the

Chapford Sale Option, Fifth Season would be entitled to the Alternate Stalking Horse Fee because the transactions contemplated by the Vida Option were a disguised sale.[5]

32. After a hearing, the Court approved the Debtors' exercise of business judgment in exercising the Vida Option and letting the Chapford Sale Option lapse (the "Final Vida Order").

33. The Chapford Sale Option lapsed on October 31, 2022, and the Debtors exercised the Vida Option on the same day.

34. The Debtors closed the Vida DIP Facility on December 15, 2022, and the Chapford DIP Facility was paid off using the proceeds thereof on that date.

**D. Defendant Demands the Alternate Stalking Horse Fee**

35. On December 1, 2022, the Debtors filed their original proposed Joint Chapter 11 Plan (the "Original Plan").  Among other things, the Original Plan contemplated that the Debtors would enter into an exit financing facility (in accordance with the already-negotiated Vida Exit Facility term sheet) with Vida as the lender.  The Original Plan never included or proposed a potential sale (under Section 363 of the Bankruptcy Code or otherwise) of any portion of the Policy Portfolio.

36. After the Debtors filed their Original Plan, on December 14, 2022, Fifth Season made its Demand for Payment of Alternate Stalking Horse Fee (the "Fifth Season Demand," a copy of which is attached as **Exhibit C**). According to the Fifth Season Demand:

> Pursuant to Section 3 of the Fee Letter, the Borrower owes the Alternate Stalking Horse Fee to Fifth Season if "the Borrower or any of its Affiliates . . . enters into definitive documentation in respect of a 363 Sale Transaction or **files a plan of reorganization which includes a sale or change of direct or indirect ownership of more than 20%** (by face amount or value) **of the life settlement portfolio assets** of the DLP Entities." . . .

---

[5] Fifth Season has made inconsistent allegations in its efforts to obtain a fee. It first claimed the financing was a "disguised sale" in its objection to Debtors' election to select or exercise the Vida Option. [See Dkt. No. 937]. Subsequently, it claimed the Debtors' Chapter 11 Plan and Vida Exit Facility included a sale of more than 20% of the policy portfolio assets.

> The Borrower and Its Affiliates have filed a plan of reorganization which contemplates the Borrower's entry into (i) the Superpriority Secured Debtor-in-Possession Credit and Guaranty Agreement (the "<u>Vida DIP Credit Agreement</u>"), by and among, *inter alios*, the Borrower and Vida Insurance Credit Opportunity Fund III GP, LLC ("<u>Vida</u>") and (ii) the Credit Agreement (the "<u>Vida Exit Agreement</u>"), by and among, *inter alios*, GWG DLP Funding VIII, LLC, a to-be-formed subsidiary of Holdings, and Vida.  The VIP Credit Agreement and Vida Exit Agreement, Individually and collectively, constitute a sale or change of direct or indirect ownership of more than 20% (by face amount or value) of the life settlement portfolio assets of the DLP Entities in favor of Vida.  Therefore, Fifth Season is entitled to the Alternate Stalking Horse Fee of $18,300,000.00 . . .

Ex. C at pp. 1-2 (emphasis in original).

37. The Debtors rejected the Fifth Season Demand in a letter dated December 22, 2023, a copy of which is attached as **Exhibit D**.

38. On February 10, 2023, the Debtors filed their Amended Chapter 11 Plan (the "<u>First Amended Plan</u>"). On March 22, 2023, the Debtors filed their Second Amended Chapter 11 Plan (the "<u>Current Plan</u>", all together with the Original Plan and First Amended Plan: "<u>Chapter 11 Plans</u>").

**E.  Defendant is not entitled to the Alternate Stalking Horse Fee**

39. Defendant only receives the Alternate Stalking Horse Fee if one of the Fee Letter's three triggering events have occurred.  But no such event has occurred:

 i. Event (a) has not occurred because the Debtors have not filed bidding procedures for a 363 Sale Transaction (nor has Fifth Season asserted such);

 ii. Event (b) has not occurred because the Original Plan, the First Amended Plan, and the Current Plan do not include a sale or change of direct or indirect ownership of more than 20% of any of the Policy Portfolio assets; and

 iii. Event (c) has not occurred because the Debtors have not conducted (and could not conduct) an out-of-court sale of the Policy Portfolio before the

July 1, 2023 Stalking Horse Fee Termination Date (and Fifth Season has

not so asserted).

40. Events (a) and (b) also include express carve-outs for a "*bona fide* financing."  The Vida

Facilities are *bona fide* financing transactions; thus, events (a) and (b) cannot be triggered.

### CLAIMS FOR RELIEF

### COUNT I – Declaratory Judgment:
### No Fee is Due under Event (a) of the Fee Letter

41. The allegations set forth in paragraphs 1-40 are incorporated herein by reference.

42. Defendant has demanded monetary relief from the Debtors under the Fee Letter.

43. An actual and substantial legal controversy exists between the parties concerning whether

the Alternate Stalking Horse Fee is due and payable under the terms of the Fee Letter or would

become due upon the consummation of the Vida Exit Facility.  The controversy entitles the Debtors

to declaratory relief under Fed. R. Bankr. P. 7001 and 28 U.S.C. ¶¶ 2201 and 2202.

44. The terms of the Fee Letter requiring payment of the Alternate Stalking Horse fee under

event (a) have not occurred and do not exist, and Fifth Season has not asserted otherwise.

45. The Debtors have not filed bidding procedures for any 363 Sale Transaction.[6]

46. Additionally, the Vida Facilities are *bona fide* financing transactions.

47. The Debtors are entitled to a judgment declaring that event (a) has not occurred, and the

Fee Letter does not require payment of the Alternate Stalking Horse Fee currently or upon the

consummation of the Vida Exit Facility.

---

[6] A "363 Sale Transaction" is defined under the Chapford DIP Facility to mean "the sale of more than 20% (by face amount or value) of the life settlement portfolio assets of the DLP Entities . . . other than any such sale or transfer (i) in the form of an exchange or grant of Equity Interests to any prepetition creditor of [GWGH and GWG Life] . . . in connection with the Cases, (ii) consisting of sales or transfers of Equity Interests of [GWGH] by its shareholders in connection with which sales or transfers no [Debtor] receives the pecuniary benefit or (iii) which otherwise (except in the case of a bona fide financing) does not result in the receipt of (or right to receive) cash proceeds by [the Debtors] consummated under Section 363 of the Bankruptcy Code."

### COUNT II – Declaratory Judgment:
### <u>No Fee is Due under Event (b) of the Fee Letter</u>

48. The allegations set forth in paragraphs 1-47 are incorporated herein by reference.

49. Defendant has made a monetary demand for relief from the Debtors under the Fee Letter.

50. An actual and substantial legal controversy exists between the parties concerning whether the Alternate Stalking Horse Fee is due and payable under the terms of the Fee Letter or would become due upon the consummation of the Vida Exit Facility. The controversy entitles the Debtors to declaratory relief under Fed. R. Bankr. P. 7001 and 28 U.S.C. ¶¶ 2201 and 2202.

51. The Debtors have not entered into any sale or change of direct or indirect ownership, by face amount or value, of the life settlement portfolio assets (of more than 20% of such value) of the SPV Entities. The Chapter 11 Plans do not seek Court approval of any sale or direct or indirect change of ownership, by face amount or value (of more than 20% of such value) of the Policy Portfolio.

52. Nothing in any of the Chapter 11 Plans requests the Court to authorize any transfer of ownership of the Policy Portfolio, directly or indirectly, to a third party.

53. Neither of the Vida Facilities evidences a transaction that is a "sale or change of direct or indirect ownership of more than 20% (by face amount or value) of the life settlement portfolio assets of the DLP Entities." Under the Vida Facilities, the Policy Portfolio transfers to a new successor entity, to be created after the confirmation of the Current Plan (the "<u>Portfolio Co</u>."). The transfer of the Policy Portfolio to the Portfolio Co. is *not* a triggering event as Portfolio Co. is under a trust still ultimately owned by creditors. Further, each of the Vida Facilities constitute *bona fide* transactions.

54. The Fee Letter and both of the Vida Facilities are governed by New York law, thus New York law governs whether the Vida Facilities constitute *bona fide* financing agreements.

55. The financing documentation underlying the Vida Option evidence intent to enter a financing transaction.

56. Under New York law, "[w]hen determining whether a transaction is a loan, substance—not form—controls." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (N.Y. 2021) (citation omitted). "In assessing the substance of financial transactions, the [New York] Court of Appeals has focused on how the contract at issue allocates risk between the parties." *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F.Supp.3d 237, 247 (S.D.N.Y. 2022). In other words, the root of the economic analysis "is the transfer of risk." *Id.*

57. Under the Vida Option, the Debtors are the party exposed to market risk in the value of the underlying Policy Portfolio; parties in such position are typically borrowers. *See Adar Bays*, 37 N.Y.3d at 334. Parties not exposed to such risk are typically the lenders. *Id.*

58. When a lender's risk is derivative or secondary (i.e., when "the lender only bears the risk" that the non-performance of an asset "will leave the borrower unable to [pay]"), the "transaction is, in substance, a loan." *See Haymount Urgent Care*, 609 F. Supp. 3d at 247 (citations omitted) (discussion in context of accounts receivable assets). The Vida Facilities both carry these trademark indicia of risk for a financing transaction, reflecting that ownership of the Policy Portfolios remains with Debtors.

59. Critically, "[i]n addition to an economic analysis of the transaction, the New York Court of Appeals has also considered objective indicia of the parties' intent to 'distinguish between intent to borrow and intent to engage in a joint transaction or exchange money for some other reason.'" *Id.* (citing *Adar Bays*, 37 N.Y.3d at 334). In other words, the transacting parties' expressed and stated intent matters, including how the parties objectively describe and structure the transaction.

Here, there is no dispute that the documents and communications evidenced intent of financings with Vida.

60. All objective indicia of the parties' intent with respect to the Vida DIP Facility reflect an intent for the Debtors to *borrow* money while retaining ownership of the Policy Portfolio. The Debtors and Vida (i) modeled the Vida DIP Facility structure upon the Chapford DIP Facility documents (and in several clear and key instances, upon better terms for the Debtors than the Chapford DIP Facility); (ii) the Vida Facilities provide liens in favor of Vida; and (iii) the Vida Facilities include typical provisions for financing transactions, including allowing the borrower to repay the debt at any time (including upon a sale of assets) subject only to payment of the prepayment premium (which as described above is no longer applicable) and obtain a full release of liens, typical change of control provisions, interest rates, events of defaults (and corresponding remedies provisions) covenants, reporting provisions, and a "portability" provision as discussed below.[7]

61. The structure and documentation of the Vida Exit Facility is modeled after the DLP VI Facility.

62. Moreover, under the terms of both Vida Facilities, the Debtors—not Vida—are the parties who stand to gain or lose based on the performance or non-performance of Policy Portfolio assets. Indeed, the Debtors stand to gain significant economic benefits if the Policy Portfolio performs in accordance with their reasonable assumptions and projections. At all times, the residual interest in the Policy Portfolio remains with the Debtors, and that residual interest is expected to yield significant value for the Debtors' estates.

---

[7] Further, the Final Order Authorizing the Vida DIP Facility [Dkt. No. 1144] specifically sets forth the required auction protocols that governs the Debtors' requirement to sell any policies under the Vida Dip Facility shall occur. The Final Order, negotiated among the parties including Vida, confirms the control and ownership of the Policy Portfolio remains with the Debtors under the Vida DIP Facility.

63. Vida has no right to any part of this residual value, and Vida is not entitled to upside of the Policy Portfolio's performance; Vida can only recover its principal and interest.

64. This stands in stark contrast to the sale that was contemplated by the Chapford Sale Option Agreement—if the Debtors exercised the Chapford Sale Option, they would have *no* upside in the future performance of the Policy Portfolio.  The Debtors would receive a one-time payment up front, and all of the upside of the Policy Portfolio's performance would belong to Chapford.

65. It is also clear that Vida has no rights of ownership under either Vida Option.  Plaintiffs retain control and management of the Policy Portfolio assets at all times, and retain all decision-making authority with respect thereto.  For example, at any time, Plaintiffs are free to sell off policies in the Policy Portfolio, a few assets at a time (at their choosing), to manage their ability to make payments under the facility, balance the LTV covenants related thereto, and maximize their upside interests in the Policy Portfolio – in each case without permission from Vida.

66. Moreover, Plaintiffs have not pursued any of the processes or procedures required under Section 363 of the Bankruptcy Code, which governs the sale of property of the estate.

67. The Chapter 11 Plans expressly provide that the Policy Portfolio will be retained, transferred to Portfolio Co., a subsidiary of the wind down trust, and liquidated in a manner that seeks to maximize and realize the residual net value of the Policy Portfolio for the benefit of the Debtors' creditors.

68. If for example, the Debtors or Portfolio Co. cannot make loan payments and/or the financing reaches certain loan-to-value thresholds, Vida can force a sale of one or more life insurance policies from the portfolio –but <u>not</u> the entirety of the Policy Portfolio. Further, Vida cannot force the Debtors or Portfolio Co. to sell the policies *to Vida*.  The Debtors have sole discretion to choose their sale counterparties.

69. Vida and the Debtors have also negotiated financing terms regarding the portability of the debt that would allow the Vida Exit Facility to be transferrable to another party in the event of a sale. Essentially, in the event that the Debtors elect to subsequently sell the Policy Portfolio, the Debtors can also transfer Vida's financing along with the Policy Portfolio. If the Vida Facilities were disguised sales, Vida would have no economic, logical, or other justification to make (and, to the contrary, every reason to resist making) its financing portable.  The terms of the Fee Letter requiring payment of the Alternate Stalking Horse fee under event (b) have not occurred and do not exist.

70. Because the Vida Facilities are *bona fide* financing transactions and the Chapter 11 Plans do not seek to effectuate the transfer of the Policy Portfolio under the Fee Letter, event (b) has not occurred and will not occur before the Stalking Horse Fee Termination date.

71. The Debtors are entitled to a judgment declaring that event (b) has not occurred and the Fee Letter does not require payment of the Alternate Stalking Horse Fee currently or upon the consummation of the Vida Exit Facility.

### COUNT III – Declaratory Judgment:
### No Fee is Due under Event (c) of the Fee Letter

72. The allegations set forth in paragraphs 1-71 are incorporated herein by reference.

73. Defendant has demanded monetary relief from the Debtors under the Fee Letter.

74. An actual and substantial legal controversy exists between the parties concerning whether the Alternate Stalking Horse Fee is due and payable under the terms of the Fee Letter or would become due upon the consummation of the Vida Exit Facility.  The controversy entitles the Debtors to declaratory relief under Fed. R. Bankr. P. 7001 and 28 U.S.C. ¶¶ 2201 and 2202.

75. Event (c) has not been triggered.  The Vida DIP Facility is not a transaction "that results or would result in a direct or indirect change of ownership of more than 20% . . . of the policy

portfolio assets." The Debtors have not sold (or sought to sell) any assets outside of their Chapter 11 Cases.

76. Additionally, the Vida Exit Facility is a *bona fide* financing, and not a sale.

77. The Debtors are entitled to a judgment declaring that event (c) has not occurred and the Fee Letter does not require payment of the Alternate Stalking Horse Fee currently or upon consummation of the Vida Exit Facility.

## **PRAYER FOR RELIEF**

WHEREFORE, the Debtors seek the following relief:

1)  That the Court adjudicate and determine the rights and liabilities of the parties to this action under the Fee Letter;

2)  That the Court find and declare that the Debtors have no obligation under the Fee Letter to pay the Alternate Stalking Horse Fee to the Defendant due to the occurrence of event (a);

3)  That the Court find and declare that the Debtors have no obligation under the Fee Letter to pay the Alternate Stalking Horse Fee to the Defendant due to the occurrence of event (b);

4)  That the Court find and declare that the Debtors have no obligation under the Fee Letter to pay the Alternate Stalking Horse Fee to the Defendant due to the occurrence of event (c); and

5)  That the Court grant such other and further relief as it may deem just and proper, including awarding costs of court incurred to the Debtors.

Houston, Texas
May 18, 2023

*/s/ Kristhy M. Peguero*
**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy M. Peguero (TX Bar No. 24102776)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:   (713) 752-4200
Email: kpeguero@jw.com
Email: mcavenaugh@jw.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**MAYER BROWN**
Charles S. Kelley (TX Bar No. 11199580)
700 Louisiana Street, Suite 2400
Houston, TX 77002-2730
Telephone: (713) 238-3000
Email: ckelley@mayerbrown.com

-and-

Thomas S. Kiriakos (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 701-0600
Email: tkiriakos@mayerbrown.com
Email: lchiappetta@mayerbrown.com

-and-

Adam C. Paul (admitted *pro hac vice*)
Lucy F. Kweskin (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone:    (212) 506-2500
Email: apaul@mayerbrown.com
Email: lkweskin@mayerbrown.com

*Counsel for the Debtors and*
*Debtors in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 18, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/*Kristhy M. Peguero*
Kristhy M. Peguero