## **EXHIBIT A**

**Execution Version**

July 17, 2022

GWG Holdings, Inc.
GWG Life, LLC
325 N. Saint Paul St. Ste. 2650
Dallas, TX, 75201-3920

    **Re:  Amended and Restated Fee Letter**

Ladies and Gentlemen:

    Reference is made to: (i) a Superpriority Secured Debtor-in-Possession Credit and Guaranty Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**") to be entered into in substantially the form filed with the Bankruptcy Court on the date hereof (or as may otherwise be agreed among the parties hereto and thereto) by and among GWG Holdings, Inc., a Delaware corporation ("**Holdings**") and GWG Life, LLC, a Delaware limited liability company ("**GWG Life**", and together with Holdings, individually, collectively and in all combinations, the "**Borrower**"), certain Subsidiaries of the Borrower party thereto from time to time, as Guarantor Subsidiaries, the Lenders party thereto from time to time and Chapford SMA Partnership, L.P. ("**Chapford**"), as Administrative Agent and as Collateral Agent, (ii) the Asset Sale Option Agreement, dated as of July 3, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Asset Sale Option Agreement**"), by and among Holdings and GWG Life, as Company Parties, and Chapford, as Counterparty and (iii) the Fee Letter, dated as of July 3, 2022 (the "**Existing Fee Letter**"), by and among Chapford, Holdings and GWG Life.  Capitalized terms used but not defined herein are used with the meanings assigned to such respective terms in the Credit Agreement.  This letter agreement is that certain "Administrative Agent Fee Letter" referred to in the Credit Agreement.

    In connection with the obligations and services to be provided pursuant to the Credit Agreement, the Borrower hereby agrees to pay to the Administrative Agent the following fees:

    1.    <u>Closing Fee</u>.  The Borrower shall pay to the Administrative Agent, for the benefit of each Lender, a closing fee (the "**Closing Fee**") in an amount equal to One Million and Three Hundred Thousand Dollars ($1,300,000), which shall be earned, due and payable in cash on the DIP Order Entry Date. The Closing Fee, when paid, shall be paid to the Administrative Agent, for the benefit of each Lender, ratably based on such Lender's Pro Rata Share.

    2.    <u>Exit Fee</u>.  The Borrower shall pay to the Administrative Agent, for the ratable benefit of each Lender, an exit fee (the "**Exit Fee**") in an amount equal to the Exit Fee Percentage (as defined below) of the sum of (i) the aggregate amount of the Commitments as of the date hereof ($65,000,000) and (ii) the aggregate principal amount of all Discretionary DIP Overadvances (if any) that are made on or prior to the date on which the Exit Fee is paid in full. As used herein, the "**Exit Fee Percentage**" shall mean one percent (1.00%). The Exit Fee shall be (a) fully earned on the DIP Order Entry Date and (b) due and payable in cash by the Borrower, on the earliest of (i) the date on which the Loans (including all Discretionary DIP Overadvances (if any)) are repaid, refinanced or terminated in full, provided that such date occurs on or after the DIP Order Entry Date, (ii) the Stated Maturity Date or (iii) the date on which the Loans (including all Discretionary DIP Overadvances (if any)) are accelerated pursuant to Section 8.2 of the Credit Agreement, provided that such date occurs on or after the DIP Order Entry Date. The Exit Fee, when paid, shall be paid to the Administrative Agent, for the benefit of each Lender, ratably based on such Lender's Pro Rata Share.

    3.    <u>Alternate Stalking Horse Fee</u>.  Solely in the event that, without duplication:

(a) the Borrower or any of its Affiliates (including, for the avoidance of doubt, any of the DLP Entities) files with the Bankruptcy Court bidding procedures in respect of a 363 Sale Transaction pursuant to which any Person other than a Lender Party is approved by the Bankruptcy Court as the stalking horse for the direct or indirect sale or transfer of more than 20% (by face amount or value) of the life settlement portfolio assets of the DLP Entities (including, for the avoidance of doubt, a sale or transfer of more than 20% of the Equity Interests in any DLP Entity, Holdings or GWG Life, other than any such sale or transfer (i) in the form of an exchange or grant of Equity Interests to any prepetition creditor of Holdings or GWG Life (excluding, for the avoidance of doubt, creditors under SPV Credit Facilities in their capacities as such) in connection with the Cases, (ii) consisting of sales or transfers of Equity Interests of Holdings by its shareholders in connection with which sales or transfers no DLP Entity, Holdings or GWG Life receives the pecuniary benefit or (iii) which otherwise (except in the case of a bona fide financing) does not result in the receipt of (or right to receive) cash proceeds by Holdings, GWG Life or any DLP Entity);

(b) the Borrower or any of its Affiliates (including, for the avoidance of doubt, any of the DLP Entities) enters into definitive documentation in respect of a 363 Sale Transaction or files a plan of reorganization which includes a sale or change of direct or indirect ownership of more than 20% (by face amount or value) of the life settlement portfolio assets of the DLP Entities (including, for the avoidance of doubt, a sale or transfer of more than 20% of the Equity Interests in any DLP Entity, Holdings or GWG Life, other than any such sale or transfer (i) in the form of an exchange or grant of Equity Interests to any prepetition creditor of Holdings or GWG Life (excluding, for the avoidance of doubt, creditors under SPV Credit Facilities in their capacities as such) in connection with the Cases, (ii) consisting of sales or transfers of Equity Interests of Holdings by its shareholders in connection with which sales or transfers no DLP Entity, Holdings or GWG Life receives the pecuniary benefit or (iii) which otherwise (except in the case of a bona fide financing) does not result in the receipt of (or right to receive) cash proceeds by Holdings, GWG Life or any DLP Entity) and which 363 Sale Transaction or plan or reorganization does not include bidding procedures pursuant to which a Lender Party is approved by the Bankruptcy Court as the stalking horse; or

(c) other than (x) a 363 Sale Transaction pursuant to which a Lender Party is approved by the Bankruptcy Court as the stalking horse or (y) a 363 Sale Transaction or other sale transaction described in the immediately preceding clauses (a) and (b), the Borrower or any of its Affiliates (including, for the avoidance of doubt, any of the DLP Entities) consummates or enters into an agreement to consummate a transaction or series of related transactions with any Person or group of Persons acting in concert that results or would result in a direct or indirect change of ownership of more than 20% (by face amount or value) of the policy portfolio assets of the DLP Entities (including, for the avoidance of doubt, a sale or transfer of more than 20% of the equity or voting interest in any entity that holds a direct or indirect interest in such life settlement portfolio assets to any Person or group of Persons acting in concert),

in the case of clause (a), (b) or (c) above, before July 1, 2023, the Borrower shall pay to the Administrative Agent, for the ratable benefit of each Lender a fee (the "**Alternate Stalking Horse Fee**") in an amount equal to $18,300,000; *provided* that

(i) solely with respect to any transaction or event described in the foregoing clause (c) occurring from and after the Expiration Time and prior to July 1, 2023, the amount of the Alternate Stalking Horse Fee shall be reduced to $9,150,000; and

(ii) for the avoidance of doubt, in no event shall the Alternate Stalking Horse Fee be payable in the event that (x) the Purchaser or its Affiliates breaches their respective obligations under the Asset Sale Option Agreement or the Asset Purchase Agreement (as defined in the Asset Sale Option Agreement) and does not cure such breach after being given a reasonable opportunity to do so or (y) a

2

Person other than a Lender Party is the stalking horse bidder for any potential or actual 363 Sale Transaction due to the Purchaser and/or its Affiliates not being ready, willing and able to act in such role on the terms set forth in the Asset Sale Option Agreement and the Asset Purchase Agreement (as defined in the Asset Sale Option Agreement).

The Alternate Stalking Horse Fee, solely if and to the extent payable pursuant to the foregoing, shall be due and payable in cash by the Borrower on the date of consummation of a 363 Sale Transaction or other sale or transaction described in clause (a), (b) or (c) above, as applicable, and shall constitute an allowed administrative expense claim under Bankruptcy Code section 503(b)(1) to the extent not satisfied in whole by the proceeds of such sale or transaction; *provided*, *however*, that in the event that one or more Lender Parties acts as a successful purchaser, buyer or other direct or indirect counterparty in respect of any transaction or series of transactions that would trigger the payment of the Alternate Stalking Horse Fee, it is understood that such Alternate Stalking Horse Fee will be satisfied by being credited against the cash purchase price payable by such Lender Parties.

"**Lender Party**" means, collectively, Owl Rock Capital Advisors LLC, the Purchaser, the Administrative Agent, any Lender or any of their respective designees, controlled Affiliates (or Affiliates under common control with them) or managed or controlled co-managed funds (or co-managed funds under common control with them).

For purposes of clarification, none of the Closing Fee, the Exit Fee or any Alternate Stalking Horse Fee shall be due or payable, in whole or in part, unless the DIP Order Entry Date occurs. Upon occurrence of the DIP Order Entry Date, the Closing Fee, the Exit Fee and Alternate Stalking Horse Fee shall all constitute "Superpriority Claims" and "Obligations" pursuant to the Credit Agreement.

The Borrower hereby agrees that, once paid, the fees or any part thereof payable hereunder and under the Credit Agreement shall not be refundable under any circumstances, regardless of whether the transactions or borrowings contemplated by the Credit Agreement are consummated. The Borrower hereby agrees that the Administrative Agent may, in its sole discretion, share all or a portion of any of the fees payable pursuant to this letter agreement with its affiliates or with any of the other Lenders. All amounts payable under this letter agreement shall not be subject to counterclaim or setoff for, or be otherwise affected by, any claim or dispute relating to any other matter. In addition, all such payments will be made without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any federal, state or local taxing authority, or will be grossed up by the Borrower for such amounts.

This letter agreement may not be amended or waived except by an instrument in writing signed by the Administrative Agent and the Borrower. This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York. **EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.** This letter agreement may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this letter agreement and/or any document to be signed in connection with this letter agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. As used herein, "Electronic Signatures" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

748685189.4

[[DMS:5863915v18]]

The parties hereto agree that effective as of the date hereof, the Existing Fee Letter is hereby amended and restated in its entirety as set forth herein.

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this letter agreement.

[Remainder of Page Intentionally Left Blank]

Very truly yours,

**CHAPFORD SMA PARTNERSHIP, L.P.,** as
Administrative Agent

By: Chapford SMA LLC, its general partner

By: _____
Name:  Scott Rose
Title:  Vice President

[Signature Page to Amended and Restated Fee Letter]

Accepted and agreed to as of
the date first written above by:

**GWG HOLDINGS, INC.**

By: _____
    Name: Murray Holland
    Title:   Chief Executive Officer

**GWG LIFE, LLC**

By: _____
    Name: Murray Holland
    Title:   Chief Executive Officer

[Signature Page to Amended and Restated Fee Letter]