United States Bankruptcy Court
Southern District of Texas
**ENTERED**
October 03, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § § | **CASE NO: 22-90032** |
| **GWG HOLDINGS, INC.,** *et al.*, | § § | **CHAPTER 11** |
| Debtors. | § § | |
| **GWG HOLDINGS, INC.,** *et al.*, | § § § | |
| VS. | § § | **ADVERSARY NO. 23-3088** |
| **FIFTH SEASON INVESTMENTS, LLC,** | § § § | |
| Defendant. | § | |

## MEMORANDUM OPINION

The Wind Down Trustee seeks summary judgment on whether Fifth Season is entitled to an $18.3 million break fee in a stalking horse bid agreement. Fifth Season Investments (f/k/a Chapford SMA Partnership) claims that the GWG entities' entry into DIP and exit loan agreements with Obra Capital (f/k/a Vida Capital) constituted a sale or change of ownership of over 20% of the GWG entities' portfolio of life insurance policies, triggering a break fee under the agreement. The Wind Down Trustee seeks an order declaring that no sale or change of ownership has occurred, alleging that the loan agreements constituted "*bona fide* financing." For the reasons set forth below, the Wind Down Trustee's motion for summary judgment is denied.

The Court notes that the summary judgment motion relies almost entirely on the structure of the loan transaction. It offers no evidentiary support regarding whether the transaction's economics were structured to create a near certainty of default. If there is a near certainty of default, a fact finder could conclude that the transaction resulted in a de facto change of ownership.

Without an examination of the underlying economics (with evidentiary support), the Court cannot grant summary judgment.

## BACKGROUND

The GWG entities hold a large portfolio of intermediate-duration and long-duration whole life insurance policies (the "Policy Portfolio"). Case No. 22-90032, ECF No. 1698 at 14. Post-petition, the GWG entities engaged in a marketing process to determine market interest in a potential sale of the Policy Portfolio. ECF No. 64-2 at 71:25–72:3. The GWG entities marketed the Policy Portfolio to around 50 different parties. ECF No. 64-2 at 37. On May 6, 2022, Obra made a preliminary bid to purchase the Policy Portfolio for $525 million. ECF No. 64-5 at 3. Obra increased its bid to $582.5 million on May 23, 2022. ECF No. 64-5 at 7. In July 2022, Fifth Season became the highest bidder during the process, with a bid of $610 million. Case No. 22-90032, ECF No. 1027 at 96:13–97:14.

The GWG entities negotiated and entered into the Chapford DIP Facility on July 17, 2022. Case No. 22-90032, ECF No. 938-8. The Chapford DIP Facility was combined with an option agreement for Chapford to serve as a stalking horse bidder in the event of a sale under 11 U.S.C. § 363, with a stalking horse bid of $610 million (subject to adjustment for policy maturities). Case No. 22-90032, ECF No. 938-9; Case No. 22-90032, ECF No. 920-1 at 14.

The Chapford Fee Letter Agreement sets out three conditions which, if they had occurred before July 1, 2023, required the GWG entities to pay Chapford an $18.3 million Alternate Stalking Horse Fee (the "Break Fee"). ECF No. 60-1 at 2–3. At issue are paragraphs 3(b) and 3(c) of the Fee Letter Agreement. Paragraph 3(a) requires payment of the Break Fee in the event of a qualifying transaction approved under 11 U.S.C. § 363. *Id.* at 3. No § 363 transaction took place during the applicable time period. Paragraph 3(b) provides that the Break Fee will be paid if:

> [T]he Borrower or any of its Affiliates (including, for the avoidance of doubt, any of the DLP Entities) enters into definitive documentation in respect of a 363 Sale Transaction or files a plan of reorganization which includes a sale or change of direct or indirect ownership of more than 20% (by face amount or value) of the life settlement portfolio assets of the DLP Entities (including, for the avoidance of doubt, a sale or transfer of more than 20% of the Equity Interests in any DLP Entity, Holdings or GWG Life . . . .

*Id.*

Among other things, paragraph 3(b) requires the GWG entities to pay the Break Fee in the event that a sale or change of ownership of over 20% of the Policy Portfolio is proposed by the Debtors in a filed chapter 11 plan. *Id.* The paragraph continues with multiple exceptions. The Wind Down Trustee alleges that an exception exists if the proposed plan authorizes bona fide financing rather than a sale or transfer. ECF No. 60 at 5–6, 11. The exception is contained in this clause:

> which otherwise (except in the case of bona fide financing) does not result in the receipt of (or right to receive) cash proceeds by Holdings, GWG Life or any DLP Entity) and which 363 Sale Transaction or plan o[f] reorganization does not include bidding procedures pursuant to which a Lender Party is approved by the Bankruptcy Court as the stalking horse . . . .

*Id.*

The exception is irrelevant to the Court's determination. If the transaction is for bona fide financing, it is axiomatic that it is not a sale or transfer. If the transaction is a disguised sale, it is not bona fide financing.

Paragraph 3(c) requires payment of a Break Fee in the following situation:

> [T]he Borrower or any of its Affiliates (including, for the avoidance of doubt, any of the DLP Entities) consummates or enters into an agreement to consummate a transaction or series of related transactions with any Person or group of Persons acting in concert that results or would result in a direct or indirect change of

>> ownership of more than 20% (by face amount or value) of the policy portfolio assets of the DLP entities . . . .

*Id.*

Under paragraph 3(c), if a qualifying transaction occurred after October 31, 2022, but prior to July 1, 2023, the Break Fee would be reduced to $9.15 million. *Id.*

The Wind Down Trustee's allegations are not supported by a declaration or an affidavit. To the extent that the allegations are not supported by the summary judgment record, they will be disregarded. Nevertheless, the allegations are repeated here for context. The GWG entities negotiated a refinancing of the Chapford DIP Agreement through the Vida Refinancing Option. ECF No. 60 at 6–7. If elected, the option would trigger the Vida DIP Refinancing Agreement to replace the Chapford DIP Facility and provide GWG with the option to enter into the Vida Exit Refinancing Option. ECF No. 60 at 6–7. The Vida DIP Refinancing Agreement consists of the Vida DIP Facility, which provides a replacement DIP loan of up to $630 million to refinance the Chapford DIP Facility and pay certain prepetition debts, and the Vida DIP Credit Agreement, which governs the Vida DIP Facility. *Id.* The Vida Exit Refinancing Option provides the GWG entities with the option to refinance the Vida DIP Refinancing Agreement at the end of the case. ECF No. 60 at 6–7. The option consists of the Vida Exit Facility, which provides an exit senior credit facility to repay the Vida DIP Facility, and the Vida Exit Credit Agreement, which governs the Vida Exit Facility. *Id.* Under the Vida Exit Refinancing Option, Obra valued the active policies, as of September 30, 2022, at $661 million. ECF No. 64-12 at 20.

The Wind Down Trustee alleges that the Vida facilities are largely modeled after other loan agreements entered into by the GWG entities. ECF No. 60 at 7–9. The GWG entities entered into the Vida Refinancing Option on October 4, 2022. Case No. 22-90032, ECF No. 865 at 9. The GWG entities exercised the Vida Exit Refinancing Option on August 1, 2023. ECF No. 60-3 at 9.

On May 18, 2023, the Wind Down Trustee filed this adversary proceeding for declaratory relief. ECF No. 1. The Wind Down Trustee of the GWG Wind Down Trust is the successor in interest of the GWG entities. Case No. 22-90032, ECF No. 1924 at 35–37. This Adversary Proceeding followed the receipt of a demand by Fifth Season for payment of the Break Fee. ECF No. 1 at 2.

Fifth Season claims that the Vida agreements can be properly characterized as a sale or transfer of ownership of over 20% of the Policy Portfolio triggering paragraphs 3(b) or 3(c) of the Fee Letter Agreement. ECF No. 64. The Wind Down Trustee seeks a declaration that no Break Fee is owed to Fifth Season as the Vida agreements constituted "*bona fide* financing." ECF No. 1 at 11, 21. On these grounds, the Wind Down Trustee moved for summary judgment on September 1, 2023. ECF No. 60.

## JURISDICTION

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a). Venue is proper in this District pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2). The dispute has been referred to the bankruptcy court under General Order 2012-6.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact means that evidence is such that a reasonable fact finder "could return a verdict for the nonmoving party." *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). It is the movant's burden to establish that no genuine issue of material fact exists. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citing *Condrey*

*v. SunTrust Bank of Ga.,* 429 F.3d 556, 562 (5th Cir. 2005)).  A party asserting that a fact cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact.  FED. R. CIV. P. 56(c)(1).  If the movant establishes "the absence of evidence supporting an essential element of the non-movant's case," the burden shifts to the non-movant to establish a genuine dispute of material fact.  *Sossamon*, 560 F.3d at 326 (citing *Condrey*, 429 F.3d at 562).

In ruling on a motion for summary judgment, a court should view the facts and evidence in light most favorable to the non-moving party.  *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014).  Nevertheless, the court is not obligated to search the record for the non-moving party's evidence.  *Keen v. Miller Env't. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012).  "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence."  *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015).  The Court need only consider the cited materials, but it may consider other materials in the record.  FED. R. CIV. P. 56(c)(3).  The Court should not weigh the evidence.  *Aubrey v. Sch. Bd. of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996).  A credibility determination may not be part of the summary judgment analysis.  *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

## DISCUSSION

The main issue in this motion for summary judgment is whether the Vida loan agreements are properly characterized as true financing or as a sale or change of ownership of the Policy Portfolio.  Genuine issues of material fact preclude the granting of summary judgment.

**I.    THE WIND DOWN TRUSTEE'S MOTION FOR SUMMARY JUDGMENT LACKS EVIDENTIARY SUPPORT**

A party seeking summary judgment bears the burden of establishing the basis for its motion and identifying the portions of the record "which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Federal Rule of Civil Procedure 56 does not impose "a duty to sift through the record in search of evidence." *Keen*, 702 F.3d at 249 (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994). A party must provide citations to specific portions of the record to which they rely. *Keen*, 702 F.3d at 249; *Forsyth*, 19 F.3d at 1537.

The Wind Down Trustee's motion is unsupported by a declaration or an affidavit and generally refers to evidentiary materials without identifying specific portions of the record that support the facts asserted.

**II.    CHOICE OF LAW**

The Fee Letter Agreement and the Vida agreements are governed by New York law. The parties stipulate that New York law governs the transaction. The Court will apply New York law in determining if a genuine issue of material fact is raised as to whether the Vida agreements constitute a sale or change of ownership of over 20% of the Policy Portfolio.

**III.    THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE VIDA LOAN AGREEMENTS ARE A SALE OR CHANGE OF OWNERSHIP OF THE POLICY PORTFOLIO**

A bankruptcy court has the authority to recharacterize debt as equity. *In re Lothian Oil Inc.*, 650 F.3d 539, 542–44 (5th Cir. 2011); *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 748 (6th Cir. 2001); *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 73–74 (Bankr. S.D.N.Y. 2007). "Recharacterization is appropriate where the circumstances show that a debt transaction was

'actually [an] equity contribution [] *ab initio*.'" *AutoStyle Plastics*, 269 F.3d at 747–48 (alterations in original) (quoting *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997).

When determining whether a transaction is a loan or a sale disguised as debt, "substance—not form—controls." *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 246–47 (S.D.N.Y. 2022) (quoting *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021)); *In re Sackman Mortg. Corp*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993) ("It is well established that a bankruptcy court, as a court of equity, may look through form to substance when determining the true nature of a transaction as it relates to the rights of the parties against a debtor's estate." (citing *Liona Corporation, Inc. v. PCH Associates, (In re PCH Associates)*, 949 F.2d 585, 597 (2d Cir. 1991))). New York courts consider the totality of the circumstances in making this determination, judging the transaction by its real character, "rather than by name, color, or form which the parties have seen fit to give it." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 122 N.Y.S.3d 309, 312 (2020) (quoting *Abir v. Malky, Inc.*, 873 N.Y.S.2d 350, 354 (2009).

"The hallmark of a loan is that the lender 'is absolutely entitled to repayment under all circumstances,' or put otherwise, the 'principal sum is repayable absolutely.'" *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 453 (S.D.N.Y. 2022) (quoting *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-CV-5120 (LJL), 2022 WL 1997207, at *10 (S.D.N.Y. June 6, 2022)). "The issue is 'ultimately about whether the transaction represented a real transfer of risk . . . so the economic substance of the transaction was a loan . . . .'" *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21 Civ. 9607 (LGS), 2022 WL 2829913, at *4 (S.D.N.Y. July 20, 2022) (citing *Haymount*, 609 F. Supp. 3d at 248). New York courts consider the "objective indicia of the parties' intent to 'distinguish between intent to borrow and intent to

engage in a joint transaction or exchange money for some other reason.'" *Haymount*, 609 F. Supp. 3d at 247 (quoting *Adar Bays*, 37 N.Y.3d at 334).

The Wind Down Trustee incorrectly asserts that this Court is limited to three factors to guide its analysis: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy. ECF No. 60 at 11–12. These factors have been applied exclusively to the merchant cash advance setting, where courts must determine whether a merchant cash advance agreement was in reality a loan subject to New York's usury laws. *See, e.g.*, *Lateral Recovery*, 632 F. Supp. at 452. Even then, these courts have held that, while relevant, the factors are far from dispositive. *See Haymount*, 609 F. Supp. 3d at 247. Courts conducting the analysis in other settings have departed from these factors. *See, e.g.*, *In re Sackman Mortg. Corp.*, 158 B.R. 926, 933–35 (Bankr. S.D.N.Y. 1993) (determining whether a transaction is a loan or participation agreement); *In re Firestar Diamond, Inc.*, 643 B.R. 528 (Bankr. S.D.N.Y. 2022) (determining whether a creditor's claims were based on secured loans disallowed under § 502(d) of the Bankruptcy Code); *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063 (2d Cir. 1995) (determining whether an assignment of accounts receivable and certain loan advances are an exchange of value or "no more than a security interest"); *Adar Bays*, 37 N.Y.3d at 334 (determining "whether a conversion option that permits a lender to convert outstanding balance to shares of stock at a fixed discount should be treated as interest").

The Vida agreements are not merchant cash advance contracts. The summary judgment motion is based on the incorrect belief that the law of merchant cash advance contracts governs this dispute. Merchant cash advance law may have some relevance to this dispute, but it is neither

controlling nor particularly helpful. Because the Wind Down Trustee is in error on this issue, the analysis in the summary judgment motion is largely inapplicable.

The fundamental issue is whether the totality of the circumstances demonstrates a de facto change of ownership of the policy portfolio. The Court considers the transaction in its totality.

### A. The Language of the Vida Agreements Is Indicative of Financing

When observed on their face, the Vida agreements appear as typical DIP and exit financing arrangements. The agreements contain loan commitments, allowing a revolving credit facility in an aggregate principal amount of up to $40 million and a term loan credit facility in an aggregate principal amount of up to $590 million. ECF No. 60-2 at 9; ECF No. 60-3 at 31–32, 36. The agreements contain maturity dates and interest rates that are adjusted based on the loan-to-value ratio, in which an increase in loan-to-value adjusts the interest rate to a higher value while a decrease in loan-to-value results in a lower rate. ECF No. 60-2 at 29, 37; ECF No. 60-3 at 25, 33. The agreements also contain standard events of default, such as nonpayment and breach of covenants, and standard default remedies, including acceleration and foreclosure. ECF No. 60-2 at 87–88; ECF No. 60-3 at 81–82. In those ways, the provisions of the Vida agreements facially demonstrate a typical lender-borrower relationship in a bankruptcy case, in which a lender extends capital while limiting its exposure to risk. But, in other ways, the documents markedly differ from typical lending transactions.

### B. The Loan-to-Value-Based Covenants Provide Obra with Significant Control over the Policy Portfolio

The first indication that the Vida agreements may have a characteristic different than what is reflected in their terms appears when looking at the effects of the unique loan-to-value-based covenants in the contracts. Under these covenants, when the loan-to-value reaches 90%, Obra may suggest sales of specific policies in the Policy Portfolio, when the loan-to-value reaches 95%, Obra

may direct the sale of specific policies in the Policy Portfolio until the loan-to-value is reduced to 85%, and when the loan-to-value reaches 100%, an event of default occurs, permitting Obra to foreclose on the Policy Portfolio. ECF No. 60-2 at 75, 87-88; ECF No. 60-3 at 78, 81-82. These provisions provide Obra with the opportunity to exercise significant control over the disposition of the Policy Portfolio.

Of course, significant control is not abnormal when a covenant breach occurs. In these cases, Fifth Season alleges that the loan-to-value ratios were *expected* to create covenant breaches that would trigger Obra's control rights. Courts do not merely look to the face of the agreement. A court must additionally consider the surrounding circumstances. *LG Funding*, 122 N.Y.S.3d at 312. If the surrounding circumstances indicate a design to allow Obra various levels of control based on expected events, then Fifth Season may be able to demonstrate that the documents are not typical loan documents.

The implications of Obra's control-based provisions are apparent when considering Obra's loan structure, which provided Obra with the ability to exercise the covenants shortly after entering into the agreement. Fifth Season has presented evidence demonstrating that the inclusion of these covenants was important to Obra's decision to enter into the financing arrangements. ECF No. 64-9 at 8. Fifth Season has also presented evidence that Obra structured the agreement such that the loan-to-value was at 88% at its inception. Case No. 22-90032, ECF No. 920-1 at 14.

Control is not the only issue. The Court must determine whether the totality of the circumstances resulted in the de facto ownership of the Policy Portfolio being transferred to Obra. Fifth Season presented Obra's loan model, which projected that the 95% loan-to-value remedy would be triggered by December 2023 and the 100% remedy by July 2024. ECF No. 64-8 (97.08% "LTV Before Payment & Accrual" by December 1, 2023, and 100.68% "LTV Before Payment &

Accrual" by July 1, 2023). As of July 2023, the loan-to-value had reached 96%, permitting Obra to direct the sale of specific policies. ECF No. 64-13 at 2. The evidence presented by Fifth Season raises a material issue as to whether Obra entered into the agreement with the intention of obtaining significant control and ownership over the Policy Portfolio over a short timeframe, suggesting an arrangement that, in conjunction with the circumstances described below, contemplates an intent to change ownership of the Policy Portfolio.

The Wind Down Trustee argues that considering of the impact of these loan-to-value based remedies is "treating hypothetical events of default or conditional loan-to-value threshold remedies as an actual transfer of interest." ECF No. 60 at 15. This argument is unavailing. Courts should consider all the effects of a transaction's terms and a party's rights upon the occurrence of an event when determine a transaction's true nature. *See, e.g.*, *Lateral Recovery*, 632 F. Supp. 3d at 457 ("The circumstances permitting the funder to call an Event of Default and to require the merchant to pay 100% of the uncollected Purchased Amount will occur long before a reconciliation could take place."); *AKF*, 632 F. Supp. 3d at 77 (alteration in original) ("First, any reconciliation hinged on Western-1's ability to produce "any [] information"—with no limitation on its scope or amount—that AKF required. The capacious phrase "any information" allowed AKF to demand materials wholly ancillary to reconciliation, impossible to obtain, or utterly fanciful."). *See generally Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410 (5th Cir. 2003).

If default was certain, or highly likely, the Court's analysis of the totality of the circumstances could be substantially affected.

### C. The Agreement Is Structured as a Quickly Defaulting Instrument

Fifth Season has presented evidence indicating that Obra structured the loan agreement as a quickly defaulting instrument. The agreement had a starting loan-to-value ratio of 88% (based

on Obra's valuation of the Policy Portfolio at $661 million), and Obra is permitted to declare a default when the loan-to-value ratio reaches 100%, allowing it to foreclose on the portfolio. Case No. 22-90032, ECF No. 920-1 at 14; ECF No. 60-2 at 75, 87-88; ECF No. 60-3 at 78, 81-82. Obra's loan model predicted that the borrower would reach a 100% loan-to-value ratio by July 2024. ECF No. 64-8 (100.86% "LTV Before Payment & Accrual" by July 1, 2024). Fifth Season submitted evidence indicating that the borrower is a special purpose vehicle with its only asset as the Policy Portfolio. Case No. 22-90032, ECF No. 1952 ¶¶ 15–16. If that proves to be true, the loan-to-value covenants may indeed weigh in favor of a finding that the agreements were a de facto sale of the loan portfolio.

### *(1)* *Obra May Bear the Risk of the Policy Portfolio's Performance*

There is a genuine dispute as to whether Obra bore the risk of the Policy Portfolio's performance. The Wind Down Trustee claims that the entirety of the downside risk remains with the GWG entities because "if the value of the Policy Portfolio decreases (raising the loan-to-value) Vida would be entitled to a *higher interest rate*." ECF No. 60 at 18. The Wind Down Trustee claims that this is the inverse of a sale, "in which Vida would share in the gains and losses of the Policy Portfolio, demonstrating the parties' intent to create a loan, not a sale." *Id.* Although this argument appears to have merit, the evidence submitted by Fifth Season raises a genuine dispute as to whether these interest rate adjustments would provide Obra with downside protection or whether they are illusory. If the special purpose entity has no ability to pay the higher interest rates, the higher interest rates provide no protection or compensation for risk.

If the portfolio fails to perform as expected, the GWG entities will default having already received the value of the portfolio through the credit facilities. On the other hand, Obra has no recourse available from the borrower, as its only asset available to satisfy the debt is the Policy

Portfolio.  Case No. 22-90032, ECF No. 1952 ¶¶ 15–16.  Although the Vida DIP Refinancing Agreement was secured by the entirety of the estate, these protections were eliminated in the Vida Exit Facility.  ECF No. 60-2 at 15.  The exit financing is solely collateralized by the equity interests and assets of Life Recovery Fund, LLC, a special purpose vehicle created for the purpose of carrying the Policy Portfolio.  The guarantor of the obligation is Life Recovery Fund Company, an entity created to hold a portion of the Policy Portfolio.  Case No. 22-90032, ECF No. 1952 ¶¶ 15–16; Case No. 22-90032, ECF No. 2064-4 at 5-7.  These circumstances suggest that the only true recourse available to Obra in the event of the portfolio's failure is to sell the portfolio and recoup the debt from the proceeds[1].  In that case, Obra would face the possibility of being unable to recover the value of its advance to the GWG entities, as determined based on its valuation of the portfolio.  If Fifth Season is correct, then Obra would bear the risk of the portfolio's nonperformance.

### D. Obra Is Anticipated to Capture All the Expected Returns of the Policy Portfolio

The Wind Down Trustee alleges that the "*amount* of residual value for the estate is simply irrelevant to the question of whether DIP and Exit Refinancing Agreements were a sale or a loan."  ECF No. 60 at 14.  A material fact issue has been raised by Fifth Season.  Fifth Season submitted evidence indicating that the transaction anticipated no residual value in the Policy Portfolio, allowing Obra to capture all the expected returns of the asset.  A transaction intended to transfer the entirety of the value of an asset is a characteristic of a sale of the asset.

---

[1] On September 28, 2023, the Wind Down Trustee filed a motion seeking the Court's approval of an emergency sale of the Policy Portfolio.  That motion may demonstrate that there was equity in the portfolio, leaving the GWG entities with the risk of loss of their equity in the Policy Portfolio.  The motion is outside of the summary judgment record and played no role in the Court's decision.

Obra's documents demonstrate that it anticipated that no residual value would remain from the transaction. ECF No. 64-14 at 8. Fifth Season also submitted evidence demonstrating the likelihood that no residual value will remain. ECF No. 64-12 ¶ 66; Case No. 22-90032, ECF No. 920-1 at 12; Case No. 22-90032, ECF No. 1027 at 48:7–9, 122:19–123:3; Case No. 22-90032, ECF No. 1922 ¶ 5. Moreover, the GWG entities expected a rate of return on the portfolio at 9.24%, exceeding the portfolio's 8.5% historic returns. Case No. 22-90032, ECF No. 1027 at 13:20–15:15. This 9.24% figure is in-line with the GWG entities' cost of financing when accounted with Obra's 1% structuring fee spread over the agreement's term. Case No. 22-90032, ECF No. 937 at 5. Obra is projected to capture the entirety of the expected upside of the portfolio as the loan-to-value reaches 100%, as summarized by Fifth Season's Expert Declaration of David J. Abell:

> Expected total interest is calculated by taking the interest rate multiplied by the amount advanced under the Vida Option (*i.e.*, 88% of Obra's Valuation of $661 million). Expected cash flow is calculated by taking the discount rate (*i.e.*, the estimated rate of return used to determine the present value of an asset) multiplied by the same valuation underlying the Vida Option ($661 million). Given that both the discount rate and interest rate were equal to 9.24% at closing, approximately 88% of the expected cash flows from the Policy Portfolio would be paid to Obra. As LTV changes over time, so will the percentage of cash flows paid to Obra. Because the LTV of the Vida Option was approximately 96% as of July 2023, the amount of cash flows from the Policy Portfolio that would be paid to Obra increased to approximately 96% as of that date. Accordingly, when accounting for an additional approximately $1 million in servicer fees, Obra is capturing approximately 97% of the cash flows from the Policy Portfolio. As LTV rates rise closer to 100%, which was contemplated by Obra's loan model projections, these fees will work to capture substantially all of the cash flows from the Policy Portfolio.

ECF No. 64-12 ¶ 49 (footnotes omitted).

**IV.** **THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE VIDA LOAN AGREEMENTS TRIGGERED THE BREAK-FEE PROVISION OF THE FEE LETTER AGREEMENT**

The Wind Down Trustee pleads for a judgment declaring:

> (1) Event (a) under the Fee Letter Agreement has not occurred and does not require payment of the Break Fee; (2) Event (b) of the Fee Letter Agreement has not occurred and does not require payment of the Break Fee; and (3) Event (c) under the Fee Letter agreement has not occurred and does not require payment of the Break Fee.

ECF No. 60 at 19.

In order for any of the events under the Fee Letter Agreement to trigger the Break Fee, the GWG entities must have entered into a transaction, either directly or by filing a plan of reorganization, prior to July 1, 2023, that proposed a sale or direct or indirect change of ownership of over 20% of the Policy Portfolio. ECF No. 60-1 at 2–3.

If the Vida Option is a disguised sale, then this condition may be met. The Court finds that the evidence submitted by Fifth Season demonstrates a genuine dispute of material fact as to the true nature of the transaction. The court denies the Wind Down Trustee's motion for summary judgment.

## CONCLUSION

The Court will enter an order consistent with this Memorandum Opinion.

SIGNED 10/02/2023

_____
Marvin Isgur
United States Bankruptcy Judge